UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

KELLY L. CEDARBERG,                          CIVIL NO. 08-5129 (ADM/JSM)

      Plaintiff,

v.                                           REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


JANIE S. MAYERON, United States Magistrate Judge.

      Defendant has denied plaintiff Kelly L. Cedarberg's application for supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. § 423.  Plaintiff brings this action seeking review of the denial of benefits.  The matter is now before the Court on cross-motions for summary judgment.  Plaintiff is represented by Timothy T. Sempf, Esq.  Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney. This Court has jurisdiction of the matter pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), and it is properly before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72(b).  For reasons discussed below, it is recommended that plaintiff's motion for summary judgment [Docket No. 5] be DENIED; and defendant's motion for summary judgment [Docket No. 6] be GRANTED.

## I.      PROCEDURAL BACKGROUND

      Plaintiff protectively filed her application for supplemental security income in January 2005, alleging disability since January 15, 2001.  (Tr. 88-90).  Plaintiff's application was denied initially, and upon reconsideration.  (Tr. 58-61, 64-67).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 54).  Hearings

were held before Administrative Law Judge William G. Brown on April 3, 2007 and October 25, 2007. (Tr. 354-92). On December 12, 2007, the ALJ issued a decision unfavorable to plaintiff. (Tr. 19-30). The Social Security Administration Appeals Council denied a request for further review. (Tr. 6-8). The denial of review made the ALJ's findings final. 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 416.1481.

Plaintiff has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c). [Docket No. 1]. The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 5] and defendant's Motion for Summary Judgment [Docket No. 6].

## II. PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least

twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); <u>see</u> <u>also</u> 20 C.F.R. § 416.909.

### A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. § 416.1407.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. § 405(b)(1); 20 C.F.R. § 416.1407.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  <u>See</u> 20 C.F.R. § 416.920; <u>see</u> <u>also</u> <u>Locher</u>, 968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

<u>Dixon v. Barnhart</u>, 353 F.3d 602, 605 (8th Cir. 2003).

### B.    Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 416.1467.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is

final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 416.1481.

### C. Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of plaintiff's impairments.

6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "The substantial evidence test employed in reviewing

administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id. In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. § 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

III.    **DECISION UNDER REVIEW**

A.      **The ALJ's Findings of Fact**

The ALJ concluded that plaintiff was not entitled to supplemental security income under section 1614(a)(3)(A) of the Social Security Act.  (Tr. 30).  In reaching this determination, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since January 11, 2005, the application date.  (20 C.F.R. §§ 416.920(b) and 416.971 *et seq.*)

2.  The claimant has the following severe impairments:  lumbar degenerative disc disease, depression, chronic pain, asthma, and degenerative changes in the cervical spine.  (20 C.F.R. §§ 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (20 C.F.R. §§ 416.920(d), 416.925 and 416.926)

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work, lifting 10 pounds occasionally and five pounds frequently, standing or walking up to two out of eight hours and sitting up to six out of eight hours, except that she requires a sit/stand option every 45 minutes, cannot climb ropes, ladders or scaffolds, or work at heights or around hazards or hazardous machinery, is limited to occasional balancing, stooping, crouching, kneeling, and crawling, must avoid concentrated exposure to gases, fumes, odors, dust, pollutants, air contaminants, and poor ventilation, and is limited to routine, repetitive instructions and tasks in the context of unskilled work.

5.  The claimant is unable to perform any past relevant work. (20 C.F.R. § 416.965)

6.  The claimant was born on August 24, 1967 and was 37 years old, which is defined as a younger individual age 18-44, on the date the application was filed. (20 C.F.R. § 416.963)

7.  The claimant has at least a high school education and is able to communicate in English.  (20 C.F.R. § 416.964)

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled. (20 C.F.R. § 416.968)

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform. (20 C.F.R. §§ 416.960(c) and 416.966)

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 11, 2005, the date the application was filed. (20 C.F.R. § 416.920(g))

(Tr. 24-29).

## B.    The ALJ's Application of the Five-Step Process

At step one of the disability evaluation, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 11, 2005.  20 C.F.R. § 416.920(b) and 416.971 et seq.  (Tr. 24).  At the second step of the evaluation, the ALJ found that plaintiff had severe physical impairments of lumbar degenerative disc disease, depression, chronic pain, asthma, and degenerative changes in the cervical spine.  20 C.F.R. § 416.920(c).  (Tr. 24).  At the third step of the evaluation, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 416.920(d), 416.925, and 416.926.   (Tr. 25).  The ALJ relied on Dr. Steiner's opinion that plaintiff's back condition did not meet the requirements of Listing 1.04, because there was no neurological loss associated with plaintiff's neck or back pain.  (Tr. 25).

The ALJ also found that plaintiff's mental impairment of depression did not meet or medically equal a listed impairment, specifically, Listing 12.04 for affective disorders. (Tr. 25).  The ALJ considered whether plaintiff's impairment resulted in at least two of

7

the following limitations: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.

The ALJ found only a mild restriction in plaintiff's activities of daily living, noting that her symptoms resulted from pain, not depression, and that she was able to care for her three-year-old child during the day. (Tr. 25). The ALJ determined that plaintiff had only mild difficulties in social functioning, because she has no problems getting along with other people. (Tr. 25). He noted that her limited ability to socialize was the result of her pain, and being the parent of young children. (Tr. 25). The ALJ ascertained that plaintiff's ability to maintain concentration, persistence or pace was limited by pain, resulting in moderate difficulties. (Tr. 25). He stated that plaintiff was taking a correspondence course to complete college, and she spent time every night on course work. (Tr. 25.) The ALJ found no episodes of decompensation in the record. (Tr. 25). Thus, he concluded that plaintiff did not satisfy the "B criteria" of Listing 12.04. The ALJ also found no evidence of the "C criteria" of the listing. (Tr. 26). The ALJ noted that he "translated the "B" and "C" criteria findings into work-related functions in the residual functional capacity assessment." (Tr. 26).

Lastly, the ALJ noted there was no evidence that plaintiff was treated for asthma exacerbations, thus, she did not meet Listing 3.03. (Tr. 26).

At the fourth step of the evaluation process, the ALJ evaluated the plaintiff's subjective complaints concerning the intensity, persistence, and limiting effects of her

symptoms based on consideration of the entire case record. (Tr. 26). He concluded that plaintiff:

> has the residual functional capacity to perform sedentary work, lifting 10 pounds occasionally and five pounds frequently, standing or walking up to two out of eight hours and sitting up to six out of eight hours, except that she requires a sit/stand option every 45 minutes, cannot climb ropes, ladders, or scaffolds, or work at heights or around hazards or hazardous machinery, is limited to occasional balancing, stooping, crouching, kneeling, and crawling, must avoid concentrated exposure to gases, fumes, odors, dust, pollutants, air contaminants, and poor ventilation, and is limited to routine, repetitive instructions and tasks in the context of unskilled work.

(Tr. 26).

In reaching this RFC, the ALJ considered plaintiff's own testimony about her symptoms. (Tr. 27). He noted that plaintiff alleged severe back pain, which prevented her from sitting or standing for any length of time, but that she could be on her feet standing and walking for two hours a day, and sit for one-half hour at a time. (Tr. 27). He also noted that plaintiff stated she could lift a gallon of milk, but she could not lift her three-year-old son, and she had indicated that stooping and crouching cause her significant pain, pain interrupted her sleep, and medication reduced her pain from a level eight out of ten, to a level six. (Tr. 27).

In finding plaintiff's testimony not entirely credible, the ALJ found that the objective medical evidence did not support her subjective complaints. (Tr. 27). He noted that plaintiff had few abnormal findings on any examination, and he found there were no neurological deficits associated with plaintiff's degenerative disc disease as the MRIs showed only mild changes. (Tr. 27). The ALJ cited the impartial medical expert's, Dr. Andrew Steiner, testimony that plaintiff could perform light work with occasional

9

bending, twisting, stooping, kneeling, crouching, crawling, and balancing, in an environment without a high level of pollutants. (Tr. 27).

Next, the ALJ considered plaintiff's daily activities, and found them to be inconsistent with her subjective complaints. (Tr. 28). The ALJ noted that plaintiff was the primary caretaker for her three-year-old son, and she could concentrate on and succeed in a correspondence course to obtain her college degree. (Tr. 28). The ALJ also noted that plaintiff's use of narcotic pain medication was a favorable credibility factor. (Tr. 28).

Finally, the ALJ considered the opinion evidence. (Tr. 28). He noted that Dr. Lang was plaintiff's primary care physician and that he had opined that plaintiff could perform less than the full range of sedentary work. (Tr. 28). The ALJ stated that he did not grant controlling weight to Dr. Lang's opinion because Dr. Lang did not cite objective findings to support his conclusions, and Dr. Lang based his estimations solely on plaintiff's statements of her limitations. (Tr. 28). Furthermore, the ALJ noted that Dr. Lang's treatment notes showed very few abnormalities on examination. (Tr. 28). The ALJ also discounted the opinions of the state agency medical consultants because they did not take into account medical records from 2006 or 2007. (Tr. 28).

Continuing at the fourth step in the evaluation process, the ALJ cited the vocational expert's report, which indicated plaintiff's work experience as a machine operator was medium, unskilled work. (Tr. 28). The ALJ concluded plaintiff could not perform her past relevant work because it exceeded her present exertional limitations. (Tr. 28).

At the fifth step of the evaluation, the ALJ determined, based on the vocational expert's testimony, that an individual with the RFC described above would be able to perform other work such as medical products inspector or assembler (D.O.T. 712.687-018), semi-conductor bonder/tender (D.O.T. 726.685-066), and electronics inspector (D.O.T. 726.684-059). (Tr. 28-29). The ALJ cited the vocational expert's testimony that there were 2,000 medical products inspector or assembler jobs in Minnesota, 4,400 semiconductor bonder/tender positions in Minnesota, and 1,200 electronics inspector positions in Minnesota. (Tr. 29). Finally, the ALJ noted the vocational expert's testimony that all of these positions allowed the worker to sit or stand at will. (Tr. 29). Therefore, he found that plaintiff was not disabled under the Social Security Act. (Tr. 30).

## IV.   THE RECORD

### A.   Background

Plaintiff was 37-years-old when she filed her application for SSI in January 2005. (Tr. 88). She completed a Disability Report for the SSA on January 21, 2005, and Disability Report Appeal forms on April 11, 2005, June 21, 2005, and September 22, 2006. (Tr. 99-137). She indicated that neck and back pain limited her ability to work, because she could not stand, sit, lie down, or drive for any length of time, and could not lift over ten pounds. (Tr. 99-100). She also indicated that she was on heavy medication for pain, which made her tired and "out there." (Tr. 100). She had been a machine operator, and she could no longer work on heavy machinery. (Tr. 100). She stated that she tried to work as a cashier, but the pain became unbearable when she was pregnant, and she stopped working in August 2002. (Tr. 100). In a Disability Report

11

Appeal, plaintiff stated that since June 21, 2005, she had to pay someone to help her with daily necessities and with her children. (Tr. 135).

### B. Medical Records

Plaintiff was treated in the emergency room at Hennepin County Medical Center on January 15, 2002, after being in an automobile accident. (Tr. 291-92). Plaintiff complained of neck pain, severe pain to her lower back, and pain and numbness in the right wrist. (Tr. 291). Numerous x-rays were negative for fracture, and plaintiff was neurologically intact. (Tr. 292, 293-97). Plaintiff could walk without difficulty on discharge. (Tr. 292). She was given prescriptions for Vicodin and Ibuprofen. (Tr. 291).

Dr. Kaye Otter, plaintiff's chiropractor, wrote a letter on January 21, 2002, noting that she was treating plaintiff for neck, low back, and right wrist conditions related to an automobile accident that occurred a week earlier. (Tr. 281). Dr. Otter opined that plaintiff could not work, or seek work, due to her pain and injury, and she would reassess plaintiff in February. (Tr. 281).

Plaintiff began treatment with chiropractor Daniel Conway on February 25, 2002. (Tr. 326-27). Dr. Conway opined that plaintiff was unable to participate in all activities until July 1, 2002. (Tr. 318).

The record is then silent until February 2004, when plaintiff was treated for abdominal pain by Dr. Donald Brandt at Fairview Ridges Hospital. (Tr. 157-58, 197-98). On examination, plaintiff was neurologically alert and oriented. (Tr. 197). Plaintiff was found to have a gallstone (cholelithiasis), and she was treated for pain. (Tr. 158-59, 197-98). Plaintiff elected to have her gallbladder removed to address her continued

abdominal symptoms. (Tr. 160-61). She underwent the surgery on March 25, 2004. (Tr. 188).

Next, plaintiff underwent a cervical spine assessment at the McEnzie Institute on May 27, 2004. (Tr. 170-71). The unidentified evaluator noted that plaintiff's cervical pain was present since a car accident two years ago, and with her pregnancy eight months ago. (Tr. 170). Plaintiff reported constant symptoms of neck, arm, leg, and low back pain. (Tr. 170). Her gait was abnormal, but her general health was otherwise good. (Tr. 170). It was recommended that plaintiff be treated with soft tissue manual therapy for four to six weeks. (Tr. 171). Her treatment appears to have ended in July 2004. (Tr. 163-69).

Plaintiff had x-rays of her right wrist, cervical, lumbar, and thoracic spine on September 30, 2004, in response to her complaints of continued pain. (Tr. 184-85). The x-ray of her wrist showed no acute fractures or dislocations of the wrist, but was suggestive of a foreign body within the soft tissues. (Tr. 184). The x-rays of the cervical spine showed reversal of the normal cervical lordosis at C4-C5, but no fractures or dislocations. (Tr. 184). The x-rays of her lumbar spine showed narrowing of the intevertebral disc space at L5-S1, with moderately advanced sclerotic changes of the facet joints, and lesser degenerative disc disease at L4-5 with no acute fractures or dislocations throughout. (Tr. 184). X-rays of the thoracic spine were also taken, and indicated mild degenerative changes throughout. (Tr. 185).

Plaintiff had an MRI of her lumbar spine on December 7, 2004, after complaining of bilateral numbness and tingling in her legs and low back pain. (Tr. 175-76). The impression from the MRI was as follows:

1. Findings that are not consistent with the patient's clinical findings of bilateral numbness and tingling which would suggest some degree of bilateral nerve root compression which is not present in this patient.
2. Large protrusion at L5-S1 to the right of midline that is not intact with the right L5 nerve root which is exiting the right L5 neuro foramen or the right S1 nerve root.
3. Mild annular tear at L4-L5 without central spinal stenosis or compromise of the lateral recesses.

(Tr. 175).

Plaintiff relocated in March 2005, and went to the Marshfield Clinic in Eau Claire, Wisconsin to establish care. (Tr. 206). She was examined in the Department of Neurology by Dr. Anil Nair. (Tr. 208). Plaintiff reported having multiple pain issues stemming from a car accident in 2002. (Tr. 206). She reported lower back pain, which radiated down both legs to the feet. (Tr. 206). She also complained of numbness in the hands and feet. (Tr. 207). Examination was normal in every respect, including cranial nerve examination, motor examination, reflexes, sensory exam, straight leg raise test, and coordination and gait. (Tr. 207-08). The only exception to the normal exam was painful restriction of movement. (Tr. 208). Dr. Nair advised plaintiff to switch from Vicodin to Neurontin for pain treatment. (Tr. 208).

About three weeks later, plaintiff was seen in Urgent Care by Dr. David Cook at the Marshfield Clinic for dental pain, and a rash on her hands. (Tr. 202-03). Plaintiff was given an ointment for her hands, and Vicodin for her dental pain. (Tr. 203).

Plaintiff sought a refill of her Vicodin at the Marshfield Clinic on May 20, 2005. (Tr. 245). Dr. Seema Rahman noted that plaintiff was following with Dr. Gasser[1] for her back issues, and he had referred her to a pain clinic for possible injections. (Tr. 245). After warning plaintiff about the possibility of dependence on Vicodin, Dr. Rahman prescribed enough Vicodin to last until plaintiff's appointment at the pain clinic. (Tr. 245).

Plaintiff underwent bilateral paravertebral nerve blocks, performed by Dr. A. Villareal at Sacred Heart Hospital in Eau Claire on June 21, 2005. (Tr. 241). On the same day, plaintiff went to Urgent Care at Marshfield Clinic for increasing low back pain and was seen by Dr. Cook. (Tr. 247). Her pain was over the sites of the injections and some numbness down into her right toe. (Tr. 247). Plaintiff appeared uncomfortable, and had pain with any movement. (Tr. 247). Her reflexes and strength were normal, but no comprehensive exam was performed. (Tr. 247). The diagnosis was low back pain, and Dr. Cook treated plaintiff with Percocet. (Tr. 248).

Plaintiff returned to Dr. Rahman for a refill of Vicodin on June 23, 2005, and it was dispensed with no refills; plaintiff also agreed to try a sample of Celebrex. (Tr. 261). Plaintiff saw Dr. Rahman on September 28, 2005, for a follow-up on her depression and to get a refill of her Vicodin. (Tr. 263). Plaintiff reported that she was tolerating Prozac with no problems, after taking it for a week. (Tr. 263). Dr. Rahman wanted to speak to Dr. Villareal, who would be seeing plaintiff for her back pain in the next two weeks, before prescribing any more Vicodin. (Tr. 263).

---

[1]     Dr. Rahman noted that she reviewed plaintiff's records from Dr. Gasser's office. (Tr. 245). The record before the Court does not contain any medical records from Dr. Gasser.

Plaintiff saw Dr. Rahman for follow-up on her treatment for depression on October 19, 2005. (Tr. 265). Plaintiff felt some improvement, but thought an increase in the dose might help. (Tr. 265). Dr. Rahman increased plaintiff's dosage of Prozac, noting that it might affect plaintiff's pain control as well. (Tr. 265).

Valerie Overton, a nurse practitioner in Eagan, Minnesota, completed a "Minnesota WorkForce Center Ability to Work/Restrictions" form on plaintiff's behalf on February 20, 2006. (Tr. 267). She reported plaintiff was being treated for chronic back pain and depression. (Tr. 267). She opined that plaintiff was unable to work, and she was not sure when plaintiff would be able to work. (Tr. 267). Ms. Overton noted "[p]atient will need time for psychiatry, physical rehab & pain specialty consult." (Tr. 267).

On November 9, 2006, Dr. David Lang of the Apple Valley Medical Center completed a "Restrictions on Ability to Work" form on plaintiff's behalf.[2] (Tr. 242-43, 254-55). Dr. Lang indicated that plaintiff could occasionally lift five to twenty pounds from the floor or a table, but only five to ten pounds overhead. (Tr. 242). He also indicated she could carry five to ten pounds. (Tr. 242). He opined that she could not climb, bend, or duck walk, and could only occasionally crawl or squat. (Tr. 242). He further opined that plaintiff would need to lie down for fifteen minutes in an eight hour work day, and would miss work for a week or longer in an average month. (Tr. 242). Dr. Lang limited plaintiff to sitting four hours a day, standing three hours a day, and walking two hours a day. (Tr. 243). He opined plaintiff was totally restricted from side to side bending, and moderately limited in driving, rotation of the trunk, and outdoor

---

[2] This is the first mention of Dr. Lang in the medical records or the Apple Valley Medical Clinic.

activity. (Tr. 243). He opined that she was mildly limited in activities involving unprotected heights, around moving machinery, rotating the head/neck, and indoor activity. (Tr. 243). Finally, he indicated that her symptoms dated back to January 15, 2002. (Tr. 243).

On March 13, 2007 Dr. Lang, responded to a request for "a treatment provider report." (Tr. 278-80, 329-31). Dr. Lang noted that plaintiff had evidence of a herniated disc on an MRI done in 2004, and he had been treating her with muscle relaxers and narcotic pain medication for several months. (Tr. 278). Dr. Lang noted that he referred plaintiff to a back surgeon, but she did not yet have an appointment. (Tr. 278). He further stated:

> [Plaintiff] states her back hurts all of the time. She cannot sit for greater than one-half hour to 45 minutes at a time. She can walk 100-200 feet before having to sit down due to the pain. She can stand long enough to do about a half sink of dishes before sitting down. She says it is very difficult to go grocery shopping, and can only do that for about 15-20 minutes. She cannot lift up her three-year-old son. She states she cannot go out in the back yard to play with him in the nice weather.

(Tr. 278). In response to several questions, Dr. Lang stated the following:

> Is treatment recommended:
>
> > I would say that she is getting treatment to some degree in terms of medications and the plan of seeing a surgeon with further treatment as indicated by his recommendation.
>
> Does this person's condition result in limitations on the amount of time she can work or participate in other activities:
>
> > She does not have any time constraints, but there are the constraints of her ability to stand, walk and sit as listed.
>
> If possible, list some types of work or activities you would recommend for this person:

I would say if she could have a job that allowed her to change positions from sitting, standing and walking as needed, she could probably perform that job.

Are there certain types of jobs or activities she should not do:

She should not do a job that requires heavy lifting, and that would be greater than ten pounds from waist height. No lifting from ground level. No repetitive bending at the waist. No heavy pushing or pulling.

Other considerations:

Nothing of note.

Does this person need accommodations in order to work or participate in work-related activities:

The accommodations would be to follow her restrictions as above, including the restrictions on the amount of time she can stand, sit and walk at one time.

Is this person making satisfactory progress:

No.

Please explain:

We are not doing anything aggressive at this point to help her improve while we are awaiting the results of the MRI and her surgical consultation. As stated, I am considering an epidural injection and perhaps a more aggressive specific form of low back physical therapy.

(Tr. 278-79).

On March 19, 2007, plaintiff's attorney wrote to Dr. Lang and asked him to specify the amount of time plaintiff could sit, stand and walk during the course of an eight-hour day. (Tr. 328). In response, on Marcy 21, 2007, Dr. Lang wrote:

I think this is basically conjectural, and to ask my opinion about this is not of much value. I stated that she can sit one-half hour to 45 minutes at a time before having to get up and move because she gets stiff and sore. I said she can only

walk 100-200 feet before she has to sit down due to the
pain, and that she can only stand at one spot long enough to
do half of a sink of dishes, which I would estimate could be
five to ten minutes.  That general outline should allow a
reasonable person to determine what a workday might look
like for Kelly.

She obviously has a low pain threshold and I am sure most
jobs she would be offered would be beyond her ability to
perform in her estimation.

(Tr. 328).

On April 3, 2007, plaintiff requested an increase in Celexa for depression from
Apple Valley Medical Clinic.  (Tr. 344).  She also reported having trouble falling asleep.
(Tr. 344).  The report stated that plaintiff could not fall asleep, her depression was worse
in the past six weeks, and her SSI hearing was scheduled for the next day.  (Tr. 344).
Plaintiff was noted to be tearful but alert.  (Tr. 344).  The assessment was depression,
insomnia and chronic low back pain.  (Tr. 344).

Plaintiff had an MRI of her lumbar spine on April 4, 2007.  (Tr. 333-34).  The
reviewing physician's conclusions from the MRI were:

1.  Broad contained right paracentral disk protrusion L5-S1
with mild posterior displacement of the right S1 nerve root
within the thecal sac.

2.  Moderate degenerative disk changes L5-S1 with mild
Modic type I changes along the vertebral endplates.

3.  Small focal posterior annular tear L4-5 without focal disk
protrusion or interspace narrowing.

4.  Remaining lumbar interspaces normal.

(Tr. 333-34).

On April 12, 2007, she was seen again Apple Valley Medical Clinic for a follow-
up visit.  (Tr. 343).  She reported that she felt more irritable after her Celexa was

increased.  (Tr. 343).  She also reported she could not walk more than 100 feet, do grocery shopping, or kneel on the ground.  (Tr. 343).  The record stated that plaintiff moved slowly, she was diffusely tender over the lumbar sacral spine, had reduced flexion, positive straight leg raising sitting and supine, and she could not sit up form laying without help.  (Tr. 343).  The record refers to depression, "degen disk disease L-S spine" and obesity.  (Tr. 342).  Vicodin was discontinued and plaintiff was started on Oxycontin.  (Tr. 342).

On May 2, 2007, plaintiff was seen for an urgent care visit at Apple Valley Medical Clinic complaining that her back was sore.  (Tr. 340).  She was out of Flexeril, Oxycontin.  (Tr. 340).  She requested a refill and was prescribed Toradal.  (Tr. 340).

On June 7, 2007, plaintiff was seen at Apple Valley Medical Clinic and complained that the Oxycontin was too strong to take in the daytime.  (Tr. 338).  She was observed to be moving slowly; the assessment was back pain.  (Tr. 338).  She was prescribed Vicodin and Oxycontin.  (Tr. 338).

On July 12, 2007, plaintiff was seen at Apple Valley Medical Clinic for refills of Celexa and Oxycontin.  (Tr. 336).  She reported ongoing back pain.  (Tr. 336).  She was observed to be walking with a shuffle.  (Tr. 336).  The assessment was low back pain, degenerative disc disease and depression.  (Tr. 336).  She was prescribed a refill of Celexa and Oxycontin.  (Tr. 336).

### C.    Hearing Before The Administrative Law Judge

Plaintiff appeared at a hearing before Administrative Law Judge William G. Brown on April 3, 2007.  (Tr. 354-79).  Plaintiff also appeared at a second hearing after submitting additional medical records.  (Tr. 380-92).

Plaintiff testified that she is not married, and has five children ages 19, 17, 8, 7, and 3. (Tr. 359-60). She lived with her fiancé and three-year-old child. (Tr. 360). She testified that she had a driver's license, but did not drive. (Tr. 360). She also testified that she was about six months away from getting a college degree, and was taking a correspondence course from Stratford College. (Tr. 360).

With regard to her work experience, plaintiff testified that she last worked in 2002 as a cashier at one store, and an assistant manager at another store. (Tr. 361). Although her car accident was in January 2001, she quit her jobs in July or August 2002, after her back pain became progressively worse. (Tr. 361).

Plaintiff testified that lower back pain was her primary problem. (Tr. 362-63). She also become extremely depressed because she has not worked. (Tr. 363).

Plaintiff testified that she was currently on Celexa for depression, but she had also tried Prozac, Efforex, and Paxil. (Tr. 363). She was also taking Tramadol, Flexeril, and Vicodin for pain. (Tr. 364). She had also just been prescribed a sleeping pill to help her sleep through pain. (Tr. 363-64). She stated that her pain was at a level of eight on a scale of ten without medication, and six on a scale of ten with medication. (Tr. 364). Plaintiff testified that she did not have any side effects from medication. (Tr. 363).

As to her daily activities, plaintiff stated that she tried to do as much with her three-year-old as she can during the day, but she could not do things like sit and play cars, or ride bikes with him. (Tr. 364). She also testified that she has trouble doing housework and grocery shopping, but she tried to do them when she is in less pain. (Tr. 364-65). Otherwise, her fiancé helps her. (Tr. 364-65).

21

With respect to her ability to lift, plaintiff testified she could lift a gallon of milk, but could not lift her son. (Tr. 368). She thought she could stand or walk for an hour or two in an eight-hour day. (Tr. 368). She testified that she hunches over, walks slowly, and can rarely stoop or crouch because she is in too much pain. (Tr. 369). She also testified that she could sit for about a half-hour at a time. (Tr. 370). She testified that she spends about six hours watching television in a day, but not all at one time. (Tr. 366).

In response to the question of whether she reads, plaintiff responded that she spent an hour a night on her coursework, and she has been getting good grades. (Tr. 366). She also indicated that she gets along with people well, and goes out to eat about once a month. (Tr. 367). Finally, plaintiff testified that she had a problem with drugs in the past, but had not taken drugs since her treatment five years ago. (Tr. 368).

Dr. Paul Gannon testified as an impartial medical expert at the first hearing. (Tr. 371). Dr. Gannon thoroughly reviewed the objective medical findings regarding plaintiff's spine, as they related to the listed impairment, 1.04 disorders of the spine. (Tr. 371-72). Dr. Gannon concluded that plaintiff did not meet or equal listing 1.04(A) because there was no evidence of nerve root compression, accompanied by sensory reflex loss and positive straight leg raising. (Tr. 372). Dr. Gannon opined that plaintiff would be restricted to sedentary work, with walking or standing up to two hours out of an eight-hour day, with occasional stooping, balancing, kneeling, crouching, crawling, and climbing. (Tr. 373). Additionally, she would need a sit/stand option, and should avoid heights or hazardous machinery. (Tr. 373).

Kenneth Ogren then testified as a vocational expert ("VE") at the first hearing. (Tr. 374). The ALJ posed the following hypothetical question to the VE regarding plaintiff's ability to work:

> assume an individual with the Claimant's age, education and work experience is impaired by disorders of the spine, depression, obesity was capable of performing sedentary work. That's lifting 10 pounds occasionally, 5 pounds frequently, standing or walking two hours out of an eight hour day, sitting six hours out of an eight hour day, would require a sit/stand option at 45 minute intervals. Cannot climb ropes, ladders or scaffolds. Can not work at heights or around hazards or hazardous machinery. Can only occasionally stoop, crouch, kneel or crawl. Could such an individual perform the Claimant's past relevant work?

(Tr. 375). The VE responded in the negative. However, he testified that such a person could perform the job of inspector [Dictionary of Occupational Titles "DOT" Code] 685.687-014, with 1,200 such jobs in Minnesota. (Tr. 376). He testified that such a person could also perform the jobs of polisher, and assembler, DOT codes 700.687-058, 700.684-104 respectively. (Tr. 376). The VE testified that there are 3,000 polisher jobs in Minnesota, and 1,200 assembler jobs, all with a 45 minute sit/stand option. (Tr. 376).

The VE was also asked to assume the restrictions set forth in Dr. Lang's March 13, 2007 report, and questioned whether such a person could perform any jobs. (Tr. 376). The VE responded in the negative. (Tr. 376). The ALJ then asked the VE to add the following additional restrictions to the first hypothetical question: routine, repetitive, unskilled work due to moderate limitations in maintaining concentration, persistence or pace. (Tr. 377). The VE testified that such a person could still perform the polisher, inspector, and assembler jobs. (Tr. 377).

The hearing was continued on October 25, 2007, because new medical records were received in the file. (Tr. 380-83). At that hearing, Dr. Andrew Steiner appeared as an impartial medical expert. (Tr. 380-383). Plaintiff testified that her medications had changed – she was now on Flexeril, Oxycontin, Vicodin, Celexa, and Ambien. (Tr. 384). She was also getting Toradol shots once a week. (Tr. 384).

Dr. Steiner reviewed the medical records, including the newly submitted records, which indicated a mild posterior displacement of the right S1 nerve root. (Tr. 386-87). Dr. Steiner noted that this impairment could lead to right-sided symptoms, but when he questioned plaintiff about pain going from her back into her legs, she testified that it was usually down the left leg. (Tr. 385-87). Dr. Steiner also noted that plaintiff was treated for asthma, arthritic changes in the neck, wrist pain, depression, with chiropractic treatment and physical therapy for back pain. (Tr. 387). Dr. Steiner testified there was no neurological loss to support a finding of meeting or equaling a listed impairment. (Tr. 387). He testified that the record supported a light residual functional capacity, with only occasional bending, twisting, stooping, kneeling, crawling, crouching, climbing, or balancing, and not working in environments with high concentrations of air pollutants. (Tr. 387).

On examination by plaintiff's attorney, Dr. Steiner testified that he could not explain the significance of positive bilateral straight leg raise tests in the record, because there was only possible nerve root irritation on the right, and none on the left. (Tr. 388). Dr. Steiner explained that the listing for spinal disorders called for much more than positive straight leg raise tests, which were a small part of the overall picture. (Tr. 388).

The ALJ then asked Norman Mastbaum, the VE, whether a hypothetical person with the same characteristics he described to the VE in the first hearing could perform any work, with the additional restriction of avoiding concentrated exposure to gases, fumes, odors, dust, pollutants, air contaminants, and poor ventilation. (Tr. 389-90). The VE testified that such a person could not perform plaintiff's past relevant work, but could perform inspector and/or assembler positions with the DOT Codes 712.687-018, 726.685-066, and 726.684-050, with 2,000 jobs in the medical products industry, 4,400 in the semiconductor industry, and 1,200 in the electronics industry. (Tr. 390). The VE further testified that each job would allow a sit/stand option at will. (Tr. 390). The VE responded that if such a person could not maintain the concentration, persistence or pace for competitive employment, she could not perform those jobs. (Tr. 390-91).

Asked whether his testimony was consistent with the DOT, the VE testified that the DOT does not allow a sit/stand option as an exertional category, but he has performed on-site analyses of all of the work described, and knows there is a sit/stand option available, with many people actually working that way. (Tr. 391). Finally, the VE testified that if plaintiff missed work for one week a month, she would not be competitively employable. (Tr. 391).

## V.    DISCUSSION

Plaintiff alleged multiple errors in the ALJ's decision. First, plaintiff contended the ALJ erred in relying solely upon the opinion of the medical expert, Dr. Steiner, and failed to grant controlling weight to the opinion of her treating physician, Dr. Lang   See Plaintiff's Brief in Support of Petition for Review ("Pltf's Brief"), pp. 2-3. Plaintiff also

asserted the ALJ failed in his duty to compile a full and fair record because he inadequately explained his reasoning for adopting Dr. Steiner's opinion. Id. p. 3.

Second, plaintiff alleged the ALJ erred in relying solely on Dr. Steiner's opinion that plaintiff did not meet or medically equal Listing 1.04, without considering evidence in the record that plaintiff's degenerative disc disease caused a loss of function or the ability to ambulate effectively. Id., p. 5 (citing to Listing 1.00(B) and 1.04). According to plaintiff, a loss of function, including the ability to ambulate, effectively equates to disability, and coupling such a musculsketal disorder with chronic pain, defined as an aggravating factor in Listing 1.00(B)(2)(d), should have guided the ALJ to make a finding of disability. Id., p. 6.

Third, plaintiff argued the ALJ erred in concluding that she did not meet or medically equal Listing 12.04, affective disorders. Pltf's Brief, pp. 6-9. Plaintiff contended the record demonstrated that she suffered more than a moderate limitation in at least two of the "B" criteria of the listing. Pltf's Brief, p. 7. Plaintiff maintained the ALJ made "the capricious conclusion that Plaintiff is limited due to pain, not depression," which are inextricably linked, and again improperly relied on the testimony of Dr. Steiner who was not qualified to make determinations based on psychological problems.[3] Id. Plaintiff further contended that the ALJ was incorrect in "[holding] against Plaintiff the fact that she is the mother of a 3 year old child." Id., p. 8. Plaintiff also claimed that the ALJ erred in finding her daily activities were not consistent with her subjective complaints. Id.

---

[3] The Court notes that Dr. Steiner provided no testimony at the October hearing regarding Listing 12.04. (Tr. 386-89). In fact, he explicitly stated that he was not commenting on plaintiff's depression. (Tr. 387).

Fourth, plaintiff challenged the ALJ's RFC finding, in that it was based solely on Dr. Steiner's opinion, and not that of her treating physician, Dr. Lang, and Dr. Steiner's opinion was based solely on the objective medical records. Id. pp. 8-9.

Fifth, plaintiff argued that the ALJ failed to consider whether the jobs the VE identified as falling within plaintiff's RFC were around heights or hazardous machinery, or whether the jobs exposed plaintiff to pollutants. Id. p. 9.

Finally, plaintiff contended the ALJ erred by ignoring all of the medications she takes. Id. p. 10.

In response, the Commissioner asserted the ALJ's decision was supported by substantial evidence in the record. Defendant's Memorandum in Support of Motion for Summary Judgment ("Def's Mem.") p. 1. The Commissioner argued the record supported the ALJ's finding that plaintiff did not meet Listing 1.04, because there was no evidence of neurological loss related to plaintiff's spinal disorders. Id. p. 16. The Commissioner also asserted the record supported the ALJ's conclusion that plaintiff's mental impairments did not meet or equal Listing 12.04, and that the ALJ properly applied the special technique to evaluate the severity of plaintiff's mental impairments. (Id. pp. 16-17).

As to the determination of plaintiff's RFC, the Commissioner argued that the ALJ properly considered plaintiff's subjective complaints, and the objective medical record in arriving at the RFC finding. Def's Mem., pp. 18-20. The Commissioner submitted that the ALJ was entitled to rely on Dr. Steiner's opinion of plaintiff's RFC, and discount Dr. Lang's opinion, because Dr. Lang did not provide any explanation for his opinion, and even noted his opinion was not of much value. Id. p. 21. The Commissioner

maintained the ALJ provided sufficient reasons for discounting Dr. Lang's opinion. Id. pp. 22-23.

Finally, the Commissioner argued that the ALJ appropriately relied on the VE's testimony regarding jobs plaintiff could perform, because the hypothetical question the ALJ posed to the VE included all of the credible limitations found by the ALJ. Def's Mem., p. 25. The Commissioner added that examination of the DOT reveals that none of the jobs identified by the VE had requirements exceeding plaintiff's RFC. (Id. pp. 25-26).

In reply, plaintiff submitted that although Dr. Lang's opinion regarding the amount of time plaintiff could sit, stand, or walk might be conjectural, his opinion that she is disabled from all work was supported by his opinion of plaintiff's low pain threshold, and the fact that plaintiff's "treatment regimen" was not effectively alleviating her pain. Plaintiff's Reply in Opposition to Defendant's Motion for Summary Judgment ("Reply"), p. 2. With respect to plaintiff's mental impairment, plaintiff again attacked the ALJ's use of plaintiff's daily activities, such as "being a mother to her child," against her. Id. p. 3. Plaintiff also asserted that her ability to get along with people was insufficient to establish that she only suffered mild difficulties in social functioning. Id.

Plaintiff closed by asserting that the ALJ erred in finding she could perform jobs in assembly or inspection when he had also determined she could not perform her past relevant work as a machine operator. See Pltf's Reply, p 5. Plaintiff argued these are "essentially the exact same category of employment," and that the ALJ gave no analysis of whether these jobs were around heights, hazardous machinery or pollutants in the air. Id.

28

The Court will address each argument within the framework of the five-step disability analysis beginning at the third step, whether plaintiff met or equaled a listed impairment.

### A.     Listing 1.04(A)

Plaintiff has the burden of proof to establish that her impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)). A listing is met when an impairment meets all of the listing's specified criteria. Id. (citing Sullivan, 493 U.S. at 530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.") A finding that an impairment or combination of impairments does not meet or equal a listing must be based on medical evidence. Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) (quoting 20 C.F.R. § 404.1526(a) and (b)).

Plaintiff claims that the ALJ erred in not finding that she met or equaled Listing 1.04(A)[4] because he failed to take into account her loss of functioning in the form of her inability to ambulate effectively, as set forth by Listing 1.00(B), and failed to account for her chronic pain as an aggravating factor to her musculoskeletal disorder, as set forth in Listing 1.00(B)(2)(d). See Pltf's Brief, pp. 5-6. Thus, it is plaintiff's position that her degenerative disc disease, coupled with her inability to ambulate and her pain, should have led to finding of a disability under the Listings. This Court finds otherwise.

The starting place for this Court's analysis is Listing 1.04(A) which provides as follows:

---

[4]     Listings 1.04(B) and (C) do not apply in this case because there is no evidence of spinal arachnoiditis or spinal stenosis.

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, <u>degenerative disc disease</u>, facet arthritis, vertebral fracture), <u>resulting in compromise of a nerve root</u> (including the cauda equina) or the spinal cord. <u>With</u>:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

As to whether plaintiff's degenerative disc disease met or equaled Listing 1.04(A), the ALJ concluded:

Dr. Steiner testified that the claimant's back condition is not severe enough to meet he [sic] requirements of listing 1.04, as there is no neurological loss associated with her neck or back impairment. I accept Dr. Steiner's testimony, as it is corroborated by the medical evidence, discussed above.[5]

(Tr. 25).

---

[5] Previously, the ALJ described the medical evidence in the record as follows:

The evidence shows that the claimant has a history of conservative treatment for back pain following auto accidents in 1999 and 2002. (Exhibits 20f, 21f, 22f) Examinations have consistently shown limited range of lumbar motion due to pain, and lumbar muscle tightness. (Exhibits 5f, 7f, 12f, 19f) An MRI scan taken in January 2005 showed an L4-5 disc herniation, without significant impingement. (Exhibit, 5f, p.2) An MRI of the lumbar spine taken in April 2007 showed a right disk protrusion at L5-S1, with mild posterior displacement of the right S1 nerve root with the thecal sac, moderate degenerative disk changes with mild Modic type 1 changes along the vertebral endplates, and a small annular tear at L4-5, with no disk protrusion or interspace narrowing. The remainder of the lumbar interspaces were normal. (Exhibit 24f).

(Tr. 24).

Dr. Steiner reviewed the medical records, and testified that there was no evidence of neurological loss to meet Listing 1.04(A). (Tr. 387). He further explained that there was only a possible nerve root irritation on the right, and plaintiff's testimony of radiation of pain from her back that usually went down her left leg and her bilateral positive straight leg raise tests, did not comport with the objective findings. (Tr. 388). Dr. Steiner noted that positive straight leg raise test was only a small part of what is needed to meet the Listing. (Tr. 388).

Any finding that an impairment or combination of impairments meets or equal a listing must be based on medical evidence. See Shontos, 328 F.3d at 424 (quoting 20 C.F.R. § 404.1526(a) and (b)). Here, there is no medical evidence in the record to support any suggestion that it was nerve root involvement that accounted for plaintiff's complaints. Lacking such evidence, this Court cannot substitute its own judgment for that of ALJ. See Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir. 2007) ("This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence.").

As to plaintiff's argument that the ALJ erred by failing take into account her inability to ambulate effectively and her chronic pain, the Court finds that this contention finds no support in the law or facts.

As stated previously, plaintiff cited to Listing 1.00(B) in support of the proposition that the ALJ failed to consider her ability to ambulate in determining whether she meets or equals the Listings. Listing 1.00, which pertains to musculoskeletal disorders (including spinal disorders under 1.04) provides in relevant part:

1.00 Musculoskeletal System

A. Disorders of the musculoskeletal system may result from hereditary, congenital, or acquired pathologic processes. Impairments may result from infectious, inflammatory, or degenerative processes, traumatic or developmental events, or neoplastic, vascular, or toxic/metabolic diseases.

B. Loss of function.

1. General. Under this section, loss of function may be due to bone or joint deformity or destruction from any cause; miscellaneous disorders of the spine with or without radiculopathy or other neurological deficits; amputation; or fractures or soft tissue injuries, including burns, requiring prolonged periods of immobility or convalescence. The provisions of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09 (see 14.00D6). Impairments with neurological causes are to be evaluated under 11.00ff.

2. How We Define Loss of Function in These Listings

a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment.

* * *

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general

definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. 404, Subpt. P, App. 1 § 1.00. (emphasis added)

Some courts have taken the position that to meet or equal a Listing under the musculoskeletal category, including Listing 1.04(A), the claimant must also demonstrate that they cannot ambulate effectively. See, e.g., Audler v. Astrue, 501 F.3d 446, 448-49 (5th Cir. 2007) (citing 20 C.F.R. 404, Subpt. P, App. 1, § 1.00(B)(2); 1.04(A)); Worth v. Astrue, No. 08-35104, 2009 WL 1396823 at *1 (9th Cir. May 20, 2009) (citing same); Brown v. Astrue, No. 4: 08-CV-483 CAS, 2009 WL 88049, *13 (E.D. Mo. Jan. 12, 2009) (citing same). Other courts have determined that because Listing 1.04(A) does not explicitly list the requirement of an inability to ambulate (as opposed to, for example, 1.04(C) which does include the requirement), the ALJ does not address the ability to ambulate factor as it relates to 1.04(A). See, e.g., Wilson v. Astrue, No. 07-4142-JAR, 2008 WL 4826138 at *5 (D. Kan. Nov. 05, 2008); Franks v. Commissioner of Social Security, No. C-1-06-810, 2008 WL 648719 at *6 n. 2 (S.D. Ohio March 10, 2008).

This Court does not need to resolve the issue of whether the inability to ambulate effectively is or is not a factor to consider under Listing 1.04(A), because here, there is no objective evidence in the record to show that plaintiff's loss of function met the definition for inability to ambulate effectively. Under the regulations, functional loss for the purpose of the Listing is defined as the inability to ambulate effectively on a sustained basis for any reason. Listing 1.00(B)(2)(a). The inability to ambulate effectively means an extreme limitation of the ability to walk. Listing 1.00(B)(2)(b)(1). "Ineffective ambulation" is defined generally as having "insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id.

In this case, while the ALJ did not rest his decision on plaintiff's ability to ambulate, there is no evidence in the record to suggest that plaintiff met the definition for ineffective ambulation. To the contrary, on the day of the accident that ultimately resulted in plaintiff's claim of disability, she was noted to ambulate without difficulty. (Tr. 292). At the hearing, she testified that she could walk for an hour or two a day and that she walked slowly and stooped over, which was consistent with what had been reported by her doctors. (Tr. 336, 338, 343, 368-69). None of the medical records reported the use a hand-held device to assist her in walking, such as crutches or canes. Thus, even though plaintiff exhibited some difficulty walking, the evidence in the record does not lead to the conclusion that her limitation was sufficiently severe, i.e. amounted to an extreme limitation of the ability to walk.

Further, even if the loss of function under Listing 1.00(B), was subsumed within 1.04(A) and it was determined that plaintiff exhibited the inability to ambulate effectively

as defined by Listing 1.00(B), that issue is moot in this case in light of the ALJ's finding that there was no evidence of neurological loss as required by Listing 1.04(A). Put another way, because there is no neurological loss, plaintiff's inability to ambulate is irrelevant to the determination of whether she met Listing 1.04(A). See Sullivan, 493 U.S. at 530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.").

This latter reasoning also applies to Listing 1.00(B)(2)(d), which deals with pain or other symptoms:

> d. Pain or other symptoms. Pain or other symptoms may be an important factor contributing to functional loss. In order for pain or other symptoms to be found to affect an individual's ability to perform basic work activities, medical signs or laboratory findings must show the existence of a medically determinable impairment(s) that could reasonably be expected to produce the pain or other symptoms. The musculoskeletal listings that include pain or other symptoms among their criteria also include criteria for limitations in functioning as a result of the listed impairment, including limitations caused by pain. It is, therefore, important to evaluate the intensity and persistence of such pain or other symptoms carefully in order to determine their impact on the individual's functioning under these listings. See also §§ 404.1525(f) and 404.1529 of this part, and §§ 416.925(f) and 416.929 of part 416 of this chapter.

20 C.F.R. 404, Subpt. P, App. 1 § 1.00(B)(2)(d) (emphasis added). While Listing 1.00(B)(2) contemplates that a loss of functioning can include pain associated with the underlying musculosketal impairment, because plaintiff did not meet the threshold requirement of a neurological loss element as required by 1.04(A), the ALJ did not error in failing to take pain into account.

In summary, even if this Court were to find that plaintiff could not ambulate as defined by the regulations (a finding which the record does not support) and was in

significant pain (for which there is evidence in the record), the plain fact is that she did

not meet the specific requirement neurological involvement as set forth in Listing 1.04.

For all of the reasons articulated above, this Court finds that the ALJ's findings

that plaintiff did not meet or equal the requirements of Listing 1.04 is supported by

substantial evidence.

**B.      Listing 12.04**

The parties do not dispute that plaintiff met the paragraph "A" criteria[6] of Listing

12.04, affective disorders.  Instead, plaintiff's challenge is over the ALJ's evaluation of

---

[6]      Paragraph (A) of 20 C.F.R. § 404, Subpart P, Appendix One, § 12.04 requires
the following findings:

> A. Medically documented persistence, either continuous or
> intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the
> following: a. Anhedonia or pervasive loss of interest in
> almost all activities; or b. Appetite disturbance with change in
> weight; or c. Sleep disturbance; or d. Psychomotor agitation
> or retardation; or e. Decreased energy; or f. Feelings of guilt
> or worthlessness; or g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or i. Hallucinations, delusions, or
> paranoid thinking; or
>
> 2. Manic syndrome characterized by at least three of the
> following: a. Hyperactivity; or b. Pressure of speech; or c.
> Flight of ideas; or d. Inflated self-esteem; or e. Decreased
> need for sleep; or f. Easy distractability; or g. Involvement in
> activities that have a high probability of painful
> consequences which are not recognized; or h.
> Hallucinations, delusions or paranoid thinking; or
>
> 3. Bipolar syndrome with a history of episodic periods
> manifested by the full symptomatic picture of both manic and
> depressive syndromes (and currently characterized by either
> or both syndromes) . . .

the paragraph "B" criteria, which was the sole basis for his determination that plaintiff did not meet Listing 12.04.[7]

Once the ALJ determines that a claimant's depression results in at least four of the nine listed symptoms in Listing 12.04(A), the ALJ must then determine whether the impairment results in at least two of the four listed functional limitations of an affective disorder. Pyland v. Apfel, 149 F.3d 873, 877 (8th Cir. 1998). Specifically, plaintiff must establish that her depression resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. § 404, Subpart B, Appendix One, § 12.04(B).

Focusing solely on the paragraph "B" criteria, the ALJ determined:

> In activities of daily living, the claimant has mild restriction. She testified that she is significantly limited in her ability to cook, do household chores and play with her young children. She spends a great deal of time lying on the couch, watching television. These limitations however, are due to pain, rather

---

[7]     Although the ALJ never addressed the paragraph "A" criteria of Listing 12.04, the Court questions whether the record supports a finding of four of the nine symptoms for depression. The record does not indicate precisely when plaintiff was diagnosed with depression, or the symptoms upon which the diagnosis was based. The only objective evidence of depression in the record is the fact that plaintiff was treated with anti-depressants. (Tr. 251, 253, 263, 265). Plaintiff did not receive any other mental health treatment, and there is no discussion in the medical records of her symptoms of depression, despite plaintiff's characterization to the contrary. See Pltf's Brief, pp. 6-7 ("Clearly, there is sufficient evidence in the record to establish the presence, 'continuous or intermittent,' of the above listed characterizations."). The fact that a claimant takes medication for depression is insufficient proof of a listing level impairment. See Walker v. Astrue, No. 4: 08CV388 MLM, 2009 WL 586585, *13 (E.D. Mo. March 6, 2009) (no severe mental impairment where only evidence was that plaintiff took medication for depression). Nevertheless, because the ALJ relied solely on the "B" criteria, and made no mention of the "A" criteria, this Court will not rest its holding on its analysis of the "A" criteria.

than symptoms of depression. I also note that the claimant is responsible for caring for her 3 year old child during the day.

In social functioning, the claimant has mild difficulties. The claimant testified that she has no problems getting along with people. She is limited in her ability to socialize due to her pain complaints and being the parent of young children.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. Her ability to persist at tasks is limited by pain. The claimant testified, however, that she is taking a correspondence course to complete her college degree, and spends an hour each night on course work.

As for episodes of decompensation, the claimant has experienced no episodes of decompensation. The claimant has not been hospitalized for psychological symptoms, and is not being treated by a psychiatrist, psychologist or other mental professional.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.

(Tr. 25).

Plaintiff argued that "[h]ad the ALJ properly considered Plaintiff's treating physician's opinions, the ALJ would have come to the conclusion that that the evidence in the record clearly demonstrates more than a moderate limitation in at least two of these categories. Rather, the ALJ relied upon the testimony of Dr. Steiner (the IME), and makes the capricious conclusion that Plaintiff is limited due to pain, not depression, although it should be noted that Dr. Steiner is not qualified to ma[k]e determinations pertaining to psychological problems."[8]  See Pltf's Brief p. 7. The plaintiff went on to

---

[8]      Again the Court notes that Dr. Steiner provided no opinion testimony regarding plaintiff's depression. See n. 3, supra.

argue that the ALJ failed to take all of plaintiff's disabling claims in context with examining her activities of daily living. Id. p. 8. In her reply brief, plaintiff argued for the first time that the ALJ substituted his opinion for that of the treating physician in finding that plaintiff only had a limited limitation in social functioning because she got along with people and cares for her child. See Pltf's Reply, p. 3.

This Court finds that the ALJ properly determined that plaintiff did not meet or medically equal Listing 12.04, affective disorders. An ALJ is required to obtain additional medical evidence if existing evidence is insufficient to determine disability. See Naber v. Shalala, 22 F.3d 186, 189 (8th Cir.1994); 20 C.F.R. § 404.1527(c)(3). "But an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Naber, 22 F.3d at 189 (citation omitted).

In this case, the medical records only provided that plaintiff started treatment for depression in September of 2005; that she experienced an improvement with medication; and that on April 3 and 12, 2007, plaintiff referred to her depression. (Tr. 251, 253, 263, 265, 274, 276, 343). Plaintiff's assertion to the contrary, there is nothing in the medical records from her providers that relates her depression to any of her alleged limitations. Indeed, her primary care provider, Dr. Lang, provided in his March 13, 2007 letter regarding her application for assistance, that her activities of daily living, such as walking, doing dishes, grocery shopping, lifting her son and playing with him outside were limited in conjunction to her complaint of back pain, and made no mention of her depression. (Tr. 329). Further, when asked about "other considerations", which could have included any impairments caused by her depression, Dr. Lang wrote

"Nothing of note." (Tr. 330). As such, there is no evidence in the medical record that is inconsistent with the ALJ's finding that plaintiff's daily activities of living were not markedly impaired due to her depression.

Moreover, plaintiffs' own statements are contrary to any assertion that she was experiencing any marked limitations for the purposes of "B" criteria set forth in Listing 12.04. See, generally, Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008) ("the ALJ was required to consider [the claimant's] own description of her pain and limitations.") (citation omitted). In this regard, plaintiff never alleged as a part of her disability reports that depression was causing her problems, or for that matter even mentioned that she was depressed. (Tr. 99-101, 108-112, 115-118, 121-25, 132-136). Further, plaintiff provided in her list of medications to the SSA that she is "taking anti depressants due to depression from back pain not being able to do the stuff I used I used to be able to. . . ." (Tr. 141). Her testimony at the hearing was the same:

> Q.     And is pain, the back pain your primary problem?
>
> A.     Yeah.
>
> Q.     As is that lower back pain or?
>
> A.     Yeah.
>
> Q.     I'm sorry.
>
> A.     It is.
>
> Q.     Take your time.
>
> A.     Lower Back pain. And because I haven't been able to work or do anything like that I become extremely depressed . . . .

(Tr. 362-63). In sum, plaintiff's own statements that her depression was caused by her back pain, supported the ALJ's finding that her limitations were the result of her back pain and not her depression.

Finally, even if plaintiff was correct that the ALJ should have concluded that her depression resulted in a marked restriction of her activities of daily living, plaintiff has provided no evidence to the Court or the SSA that her depression resulted in marked difficulties in the areas of social functioning or concentration, persistence or pace, or that she had repeated episodes of decompensation of an extended duration. While in her Reply, plaintiff challenged the ALJ's finding that she had mild difficulties in social functioning based on her testimony that she got along well with people, she pointed to no evidence in the record to suggest a more restrictive limitation. In short, plaintiff has presented no evidence in the record to support a finding that her depression resulted in at least two of the four listed functional limitations of an affective disorder.

At the end of the day, the burden is on plaintiff, as the claimant, to establish that her impairment meets or equals the Listings, which equate to demonstrating that the impairment meets all of specified criteria. See Johnson, 390 F.3d at 1070 (citation omitted); see also Sullivan, 493 U.S. at 531 ("a claimant . . . must present medical findings equal in severity to all the criteria for the one most similar listed impairment"). Plaintiff has failed to provide any medical evidence or any other facts to support the finding that her depression resulted in marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation. See Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005) (rejecting "out of hand" appellant's conclusory assertion that ALJ

failed to consider whether he met certain listings where appellant provided no analysis of relevant law or facts); see also Breeze v. Astrue, No. 07-CV-2283(JMR/RLE), 2008 WL 4181754 at *19 (D. Minn. Sept. 08, 2008) (citations omitted) ("However, Dr. Lachance did not so much as intimate that the Plaintiff suffered from epilepsy of Listings-level severity -- even though Dr. Lachance practices the specialty of neurology, and was plainly completing a Social Security Form. Since the Plaintiff bore the burden of demonstrating, at the Third Step, the severity of his epilepsy, it would have been a simple matter for the Plaintiff to have secured an opinion of Dr. Lachance, if the neurologist had an opinion that the Plaintiff's epilepsy satisfied the requirements of the Listings, or surpassed them."). Plaintiff's assertion that the ALJ ignored her treating physicians in failing to find marked difficulties based on her depression finds no support in the record, as her treating physicians never made such findings. At most, they noted her depression. Having failed to point the Court to any evidence to support her alleged marked limitations due to depression, plaintiff did not met her burden to show that she qualifies as disabled under Listing 12.04.

Given the available medical evidence in the record, plaintiff's own statements and the fact that she has not met her burden of proof as to whether her mental condition meets or equals Listing 12.04, this Court concludes that the ALJ's finding that plaintiff did not meet the "B" criteria set forth in Listing 12.04, is supported by substantial evidence in the record.

## C. Residual Functional Capacity Determination

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). The ALJ must determine a claimant's RFC by considering the

combination of the claimant's mental and physical impairments. <u>See</u> <u>Baldwin v.</u> <u>Barnhart</u>, 349 F.3d 549, 556 (8th Cir. 2003). However, it is the claimant's burden, not the Commissioner's, to prove the RFC. <u>Pearsall v. Massanari</u>, 274 F..3d 1211, 1217 (8th Cir. 2001) (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)).

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. <u>Id.</u> The RFC determination must be supported by "medical evidence that addresses claimant's ability to function in the workplace[.]" <u>Baldwin</u>, 349 F.3d at 556 (quoting <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)). However, the ALJ is not limited solely to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional." <u>Baldwin</u>, 439 F.3d at 556 (citing 20 C.F.R. ' 404.1545(c)).

### 1.    Medical Opinions

A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record; on the other hand, an ALJ need not accept the opinion if it does not meet those criteria. <u>Clevenger v. Social Sec.</u> <u>Admin.</u>, --- F.3d ---, No. 07 3447, 2009 WL 1544439, *3 (8th Cir. June 4, 2009). If a treating physician's opinion is not given controlling weight, then the following factors are applied to determine the amount of weight to be given to a non-controlling medical opinion:

(1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the

opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d) Wagner v. Astrue. 499 F.3d 842, 848 (8th Cir. 2007)).

The ALJ may consider the opinions of nonexamining sources, including medical experts consulted by the ALJ, so long as the six factors described above are considered. See 20 C.F.R. §§ 404.1527(f)(2)(iii). Further, although the opinion of a nonexamining consulting physician alone does not generally constitute substantial evidence, where the ALJ does not rely solely on the opinion of this physician, but also conducted an independent review of the medical evidence, the ALJ's determination of a claimant's RFC may be upheld. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995)).

Plaintiff maintained the ALJ erred in relying solely upon the opinion of the medical expert, Dr. Steiner, in devising the RFC for plaintiff and failed to grant controlling weight to the opinion of her treating physician, Dr. Lang. Pltf's Brief, pp. 2-3, 9. Plaintiff's argument fails for two reasons: First, the record supports the ALJ's decision not to accord Dr. Lang's opinions regarding plaintiff's functionality controlling weight (Tr. 28), and second, the ALJ did not base his RFC determination solely on the opinions of Dr. Steiner.

The ALJ refused to give Dr. Lang's opinion that plaintiff could perform less than the full range of sedentary work controlling weight because Dr. Lang based his estimations solely on plaintiff's statements of her limitations, his treatment notes showed very few abnormalities on examination, and he did not cite to any objective findings to

support his conclusions. (Tr. 28). The Court agrees with the ALJ's assessment of Dr. Lang's opinions.

First, Dr. Lang's records reflect virtually no objective findings upon physical examination of plaintiff. (Tr. 170, 207-08, 247, 291-97, 336, 338, 343). As the ALJ noted, the records cite to few abnormal findings on any examination – plaintiff exhibited some limited range of motion due to pain and muscle tightness but no muscle spasm, and there were no neurological deficits noted that were associated with her degenerative disc disease. (Tr. 27). Additionally, the x-rays and MRIs of plaintiff's spine revealed only mild to moderate degenerative changes. (Tr. 175-76, 184, 333-34).

Second, Dr. Lang's discussion as to what plaintiff could or could not do was based only on her statements to him about what she could or could not do. (Tr. 278, 343). His observations regarding her limitations were confined to her walking slowly or shuffling, and exhibiting difficulty sitting up from a prone position. (Tr. 336, 338, 343).

Third, none of Dr. Lang's functional assessments cited to any objective findings to support the limitations he was placing on plaintiff. (Tr. 242-43, 278-80, 328). Fourth, none of the other medical records provided by plaintiff contain objective findings that contradict the objective findings described by Dr. Lang. (Tr. 170, 175-76, 184, 207-08, 281, 247, 291-97.)

Finally, this Court cannot ignore Dr. Lang's own statement in his letter to plaintiff's attorney on March 21, 2007, that his opinions regarding plaintiff's ability to sit, stand or walk were basically "conjectural" and "not of much value." (Tr. 328).[9]

---

[9] In her Reply, plaintiff argued that although Dr. Lang's opinion regarding the amount of time plaintiff could sit, stand, or walk might be conjectural, his opinion that she is disabled from all work was supported by his opinion of plaintiff's low pain

For all of these reasons, this Court finds that substantial evidence in the record support the ALJ's conclusion that Dr. Lang's opinions of plaintiff's functionality are not supported by objective medical evidence. And, as set out in the next section, Dr. Lang's opinions are inconsistent with the balance of the record. Therefore, the ALJ's decision not to accord Dr. Lang's opinions controlling weight on what plaintiff could and could not do is supported by substantial evidence in the record.

As to plaintiff's suggestion that the ALJ relied exclusively on Dr. Steiner's assessment of impairments for the RFC, (Pltf's Brief, p. 9), a careful review of the ALJ's decision establishes the opposite. While the ALJ did state that he was relying on Dr. Steiner's opinions as to whether plaintiff met Listing 1.04(A), (Tr. 25), he did not make the same statement with respect to Dr. Steiner's testimony on the limitations he would place on plaintiff. To the contrary, after setting forth Dr. Steiner's opinion that plaintiff retained a light residual functional capacity with a sit/stand option, (Tr. 27, 387), the ALJ did not adopt Dr. Steiner's opinion of a light RFC. Rather, based on his own examination of plaintiff's testimony, his review of the objective medical evidence, Dr. Steiner's opinion that plaintiff could perform light exertional level work, her daily activities and the opinions and records of Dr. Lang, he reduced plaintiff's RFC to a less then sedentary exertional capacity. (Tr. 27-28). Where, as here, the ALJ did not rely solely on the opinion of Dr. Steiner, but conducted his own independent review of the

---

threshold. Reply, p. 2. However, what Dr. Lang said was "[s]he obviously has a low pain threshold and I am sure most jobs she would be offered would be beyond her ability to perform in her estimation." (Tr. 328) (emphasis added). This statement does not suggest Dr. Lang believed plaintiff could not perform any work due to her low pain tolerance, but that plaintiff believed this to be so.

medical evidence and the record as a whole, the ALJ's determination of plaintiff's RFC may be upheld. See Krogmeier, 294 F.3d at 1024 (citing Anderson, 51 F.3d at 779.)

##### 2. Credibility Analysis

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)). The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness, and side effects of medication; and

5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." Cox, 160 F.3d at 1207. The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of plaintiff's subjective complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th

Cir. 1996) (citing <u>Smith v. Shalala</u>, 987 F.2d 1371, 1374 (8th Cir. 1993.))  For example, the ALJ may find a claimant's subjective complaints inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence."  <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996); <u>see</u> <u>also</u> <u>Cox</u>, 160 F.3d at 1207.

If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony."  <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in <u>Polaski</u> when making credibility determinations."  <u>Id.</u> On the other hand, the failure to address each of the <u>Polaski</u> factors separately does not render the ALJ's determination invalid.  <u>See</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the <u>Polaski</u> factors and by identifying inconsistencies between the claimant's statements and evidence in the record); <u>see</u> <u>also</u> <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each <u>Polaski</u> consideration, so long as he acknowledged and examined those considerations).  Ultimately, the determination of a claimant's RFC, and the determination of whether a claimant is disabled are issues reserved to the Commissioner.

In challenging the ALJ's determination of her RFC, plaintiff made four arguments: (1) Her daily activities of cooking and playing with her children did not support the ALJ's finding that her subjective complaints are not credible; (2) "[t]he ALJ failed to take into consideration all of claimant's disabling claims in context with examining her daily

functioning and activities. . ."; (3) it was surprising that the ALJ had discredited her subjective complaints, but assigned her a RFC "nearly in-line with the symptoms Plaintiff complains of . . ."; and (4) he ignored the amount of medication she takes. Pltf's Brief, pp. 8, 10.

Plaintiff claimed that the ALJ failed to take into account all of her "disabling claims" in analyzing her daily activities.[10] As a preliminary matter, the Court notes that plaintiff never explained what disabling claims the ALJ failed to consider. Regardless, the record establishes that plaintiff was the primary caregiver for her three-year-old child, she was able to do some cooking and housework, and she was successfully engaged in a correspondence course. These activities are consistent with the ability to perform a limited range of sedentary work as outlined by the ALJ. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (affirming RFC for limited range of sedentary work where claimant was primary caretaker for her home and two small children); Johnston v. Apfel, 210 F.3d 870, 874-75 (8th Cir. 2000) (affirming ALJ's adverse credibility finding where claimant's daily activities included some cooking, some housework, caring for young daughter, some reading and watching television, and attending classes).

Regarding plaintiff's contention that the ALJ was inconsistent in finding her not credible, but then assigned her a RFC "nearly in-line with the symptoms" of which she complained, this can simply be explained by the fact that the ALJ did not totally discount plaintiff's subjective complaints of pain and depression, but he found only that her

---

[10]     The Court notes that in the Disability Report Appeal forms dated June 21, 2005, and September 22, 2006, plaintiff stated that she had to pay someone to help her with her cleaning, daily necessities, grocery shopping, and watching her children. (Tr. 125-26, 135-36). However, plaintiff never reported this to anyone who was treating her for pain in that timeframe, nor did she provide this information at the hearing before the ALJ in April 2007.

"statements concerning the intensity, persistence and limiting effects" of her symptoms were not entirely credible. (Tr. 27). In other words, the ALJ did not ignore plaintiff's complaints; he reduced her RFC to less than a full sedentary exertional level to take them into account.

Finally, regarding plaintiff's argument that the ALJ had ignored all of the medication she takes, the opposite is true. The ALJ actually found that plaintiff's use of narcotic pain medication was a favorable credibility factor. (Tr. 28). More importantly, however, although plaintiff had reported medication side effects in some of her Disability Reports to the SSA, (Tr. 100), at the hearing, she testified she <u>did not</u> suffer side effects from medication, and in fact, her pain medication reduced her pain from a level eight to a level six out of ten. (Tr. 363-64). <u>See</u> <u>Swarnes v. Astrue</u>, Civ. No. 08-5025 KES, 2009 WL 454930 (D.S.D. Feb. 23, 2009) (ALJ properly discredited credibility where Plaintiff alleged medication side-effects in Disability Report but later admitted he suffered no side effects).

Taken together, the lack of objective medical findings to support her subjective complaints, the medical expert's testimony, plaintiff's ability to engage in daily activities inconsistent with complete disability, and her testimony regarding her medication, this Court finds that substantial evidence supports the ALJ's RFC determination.

### D.    Ability to Perform Other Work

Plaintiff argued the ALJ failed to consider whether the jobs the VE identified as falling within her RFC were around heights or hazardous machinery, or whether the jobs exposed her to pollutants. Pltf's Brief, p. 9. The record simply does not bear out this contention. The hypothetical question the ALJ posed to the VE explicitly included

restrictions of working around heights, hazardous machinery, and multiple types of pollutants. (Tr. 389-90). The VE testified that such a person could perform inspector and assembly jobs in the medical products and semi-conductor industries. (Tr. 300).

Plaintiff also asserted that if she cannot perform her past relevant work as a machine operator, she cannot perform the jobs identified by the VE because they are "essentially the exact same category of employment." Pltf's Reply, p. 5. Plaintiff cited no evidence to support this contention, and again the record does not bear it out. In a Disability Report, plaintiff indicated she daily lifted and carried boxes and bags weighing 25-150 pounds in her job as a machine operator, which she held on and off from 1985 through the 1990s. (Tr. 101). The RFC created by the ALJ did not allow plaintiff to lift items in excess of 10 pounds, and the VE testified that a person with the sedentary RFC described by the ALJ could perform inspector and assembly jobs, which actually allowed a sit/stand option at will.

The testimony of a vocational expert which is based on a hypothetical question that captures the concrete consequences of the claimant's deficiencies is substantial evidence upon which the ALJ can rely in determining a claimant's ability to work. Roberts v. Apfel, 222 F.3d 466, 471 (8th Cir. 2000). Therefore, the ALJ's determination that there was other work that existed in significant numbers in the national economy that plaintiff could perform is supported by substantial evidence, and should be affirmed.

## VI. CONCLUSION

For all of the reasons discussed above, the Court concludes that substantial evidence in the record supports the ALJ's determination that plaintiff did not meet or equal Listings 1.04(A) or 12.04. Substantial evidence in the record also supports the

ALJ's weighing of the medical opinions, his credibility analysis, and ultimately, his residual functional capacity determination. Finally, the vocational expert's testimony that there are a significant number of jobs in the national economy that a person with plaintiff's characteristics and impairments can perform is supported by substantial evidence in the record.

In conclusion, this Court finds that there is substantial evidence in the record to support the ALJ's determination that plaintiff is not disabled within the meaning of the Social Security Act.

## VII. RECOMMENDATION

IT IS HEREBY RECOMMENDED THAT:

1. Plaintiff's Motion for Summary Judgment [Docket No. 5] be denied;

2. Defendant's Motion for Summary Judgment [Docket No. 6] be granted.


Dated: August 14, 2009


s/ *Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 31, 2009**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.